**Judy Gail ALFORD, Plaintiff,**

v.

**BLUE CROSS AND BLUE SHIELD OF ALABAMA, INC., Defendant.**

**Civil A. No. 94–AR–1881–M.**

United States District Court,
N.D. Alabama,
Middle Division.

Dec. 6, 1995.

---

J. Gullatte Hunter, III, Ford & Hunter, Gadsden, AL, for Judy Gail Alford.

B. Clark Carpenter, Jr., William W. Lawrence, O. Stanley Thornton, Wooten Thornton Carpenter O'Brien & Lazenby, Talladega, AL, for Blue Cross and Blue Shield of Alabama, Inc.

### MEMORANDUM OPINION

ACKER, District Judge.

Defendant, Blue Cross and Blue Shield of Alabama, Inc. ("Blue Cross"), removed the above-entitled action from the Circuit Court of Etowah County, Alabama, pursuant to 28 U.S.C. §§ 1331 and 1441 based on the existence of a preemptive federal question. The complaint of Judy Gail Alford ("Alford") was based on her employee medical benefit plan. Because her claim relates to the Employee Retirement Income Security Act of 1974 ("ERISA"), Blue Cross was provided the removal opportunity. Because the Eleventh Circuit denies jury trial in ERISA cases that, in practical effect, are actions for breach of an insurance contract, this court granted Blue Cross's motion to strike Alford's jury demand and conducted a bench trial of Alford's claim that her surgery was covered.

Alford sued only after Blue Cross refused to pay.

Blue Cross withdrew its non-exhaustion defense and never asserted a meritorious, if technical, defense based on the fact that Alford's self-insured employer, Baptist Memorial Hospital of Gadsden ("Baptist"), the plan administrator, was an indispensable party not named as a defendant. Ostensibly Baptist had a much larger stake in the outcome than Blue Cross did, that is, if Blue Cross had any monetary exposure whatsoever. The court took under advisement Blue Cross's oral motion for judgment as a matter of law interposed at the close of Alford's case.

After hearing the testimony and reading the documentary evidence, the court finds the pertinent facts to be as follows:

### Findings of Fact

Alford was a nurse employed by Baptist which had a medical benefits plan for its employees. Blue Cross was the "claims administrator." As such, Blue Cross was responsible for issuing or denying pre-certification requests and for processing and evaluating claims, including the ultimate responsibility for granting or denying claims based on its findings of fact and its interpretations of the plan document.

Alford received a "plan summary," but, prior to her undergoing the surgical procedure out of which this claim arose, she was never presented with a copy of the plan itself. The plan summary prominently featured the Blue Cross logo on its cover. It would have taken two Philadelphia lawyers to deduce from the plan summary that Blue Cross was not the actual insurer. Blue Cross basically designed the plan, using language identical to language employed by it in similar plans in which it itself was the insurer. As already indicated, the plan granted Blue Cross broad discretion in determining whether or not a particular medical expense was covered, but Blue Cross's relationship with Baptist, a good customer, was of the kind and character to give Blue Cross another vested interest, if it did not already have one, in exercising its discretion, to the extent possible, so as to find disputed facts and to

interpret the plan language in ways that would result in a denial of benefits, despite its fiduciary obligation to the plan beneficiaries. For aught appearing, Blue Cross selected counsel who have defended it, not Baptist, in this action, although, as stated, Blue Cross was only the claims administrator and, as such, purportedly had no liability. It is interesting to say the least that a non-insurer would not deny liability on the basis that it is not a signatory to Alford's contract, but rather an agent of Baptist. It would be interesting to know whose pocket the expenses for defending Blue Cross will ultimately come out of. The contract between Blue Cross and Baptist was not offered into evidence, so the matter of who will pay what, if relevant, must be left to speculation.

The plan summary bears an effective date of January 1, 1988. It was never thereafter amended, despite the fact that the plan itself was amended on July 1, 1991. The plan summary provided, *inter alia:*

**Preadmission Certification—PAC**
Required for all hospital admissions except maternity and emergency admissions.

\*    \*    \*    \*    \*    \*

**Preadmission Certification**
All hospital admissions (except maternity and emergency admissions) are subject to Preadmission Certification. This program is designed to *assure you in advance* that a hospital admission for you or your covered family member is medically necessary or if treatment may be provided in a more cost-effective manner. (emphasis supplied).

Preadmission Certification works before you or your dependents are admitted to the hospital. You must provide details of your proposed admission to Blue Cross and Blue Shield of Alabama. You are then advised, before you are admitted, of the determination of whether the admission is medically necessary as defined by the Blue Cross contract. Remember, you are responsible for obtaining Preadmission Certification. **If you do not receive approval prior to a hospital admission, Blue Cross and Blue Shield of Alabama will not pay for your hospital stay.**

(emphasis in original).

\*    \*    \*    \*    \*    \*

HEALTH BENEFITS EXCLUSIONS
The following situations and conditions are not covered under any part of your plan:

.    .    .    .    .

Cosmetic surgery.

.    .    .    .    .

Dental treatment for or related to temporomandibular joint (TMJ) disorders. This includes Phase II, according to the guidelines approved by the Academy of Craniomandibular Disorders. These treatments permanently alter the teeth or dental occlusion and include such services as equilibration, shaping the teeth, reshaping the teeth, restorative treatment, prosthodontic treatment, full mouth rehabilitation,. orthodontic treatment or a combination of these treatments.

\*    \*    \*    \*    \*    \*

COVERED DENTAL SERVICES
**Supplemental Basic Services**
Benefits are provided at 100% of the usual, customary and reasonable charge for the following services and supplies.

\*    \*    \*    \*    \*    \*

General anesthesia when medically necessary and rendered in connection with oral or dental surgery. Anesthesia is "general" when anesthetic drugs or agents are administered by injection or inhalation and when it is given for relaxing muscles, loss of sensation, or less of consciousness. (It does not include analgesics, drugs given by local infiltration, or nitrous oxide).

The full plan document, which was never read by Alford prior to her surgery, provided, *inter alia:*
**SECTION I—DEFINITIONS**

\*    \*    \*    \*    \*    \*

"Cosmetic Surgery" means any surgical procedure that primarily improves or changes appearance and does not primarily improve physical bodily functions or correct deformities resulting from disease, trauma or congenital anomalies. Improvement of physical bodily function does not

include improvement of psychological effects caused by physical defects or conditions.

\* \* \* \* \* \*

## SECTION VI—EXCLUSIONS

No benefits shall be provided with respect to the following, whether or not recommended or prescribed by a Physician:

\* \* \* \* \* \*

3. Cosmetic Surgery.

4. Services or expenses for the care, treatment, filling, extraction, removal, replacement or augmentation of teeth or structures directly supporting the teeth (including subperiosteal implant devices). "Structures directly supporting the teeth" means the periodontium, which includes the gingivae, dentogingivial junction, periodontal membrane, cementum, and aveolar process. Also excluded are periodontal care, prosthodontal care, endodontic care, orthodontic care, or any other dental care. Services or expenses for hydroxyapatite or any material with a similar purpose are also excluded. This exclusion does not apply to those services by a Physician to treat or replace natural teeth when injured by Accidental Injury covered as Major Medical Benefits by Paragraph 2.(1) of Section III.B. or covered as Supplemental Accident Benefits by Section III.E.

. . . . .

23. Services or expenses for or related to treatment of temporomandibular joint (jaw hinge) disorders which permanently alter the teeth or dental occlusion including, but not limited to, equilibration, shaping the teeth, reshaping the teeth, restorative treatment, prosthodontic treatment, full mouth rehabilitation, orthodontic treatment or a combination of these treatments or any other method to alter vertical dimension.

. . . . .

41. Services or expenses of any kind which include care, treatment, services, supplies, or equipment within or related in any way to the oral cavity, regardless of whether required by congenital, developmental or accidental conditions, regardless of whether the purpose is to correct conditions within or without the oral cavity and regardless of whether necessary to enable a Physician to render other services which are Medically Necessary. By way of example and not limitation, braces to prepare an individual with a cleft palate for orthopedic surgery, for orthognathic surgery or any other procedure would not be covered. This exclusion does not apply to those services by a Physician to treat or replace natural teeth when injured by Accidental Injury covered as Major Medical Benefits by Paragraph 2.(1) of Section III.B.

Prior to April, 1992, during a time when Alford was an employee beneficiary of this particular plan, her lower jaw suffered atrophy to such an extent that it had a popping sound, she had difficulty in chewing, she had headaches, and her teeth hurt. Her oral surgeon, Dr. Patrick Louis, who is an M.D. as well as a dentist, recommended surgery to her jaw, adding bone harvested from her hip, requiring the repositioning of a nerve, followed by teeth implantation. There was nothing about the proposed procedure that was cosmetic in nature. Dr. Louis explained to Alford that the implantation portion of the procedure, as he understood her benefit plan, would not be covered by the plan, and she thereupon agreed to pay for that portion herself. In accordance with usual and customary practice, and as required by the plan, Dr. Louis described to Blue Cross his proposed procedure in advance of hospital admission and sought and obtained written precertification for Alford's admission. The surgery was scheduled for April 8, 1992, a fact of which Blue Cross was aware.

On April 7, 1992, Blue Cross wrote and mailed a letter to Alford at her residence address. It said:

Our Medical Review staff received a hospital precertification request for this patient to University of Alabama Hospital on April 8, 1992. We are confirming that all pread-

mission requirements have been met. However, the proposed surgical procedure appears to be cosmetic in nature.

Cosmetic surgery is not covered under your current contract benefits. *Should an admission occur, payment of benefits will be subject to further medical review to determine if this surgery is cosmetic in nature.*

We have notified Dr. Patrick J. Louis and the hospital of this decision. (emphasis supplied).

Exactly how Blue Cross thought its letter of April 7, 1992, would be received and comprehended by Alford before her surgery on April 8, 1992, is anybody's guess. However, if Alford had received the letter prior to her surgery, she would have felt perfectly secure in the knowledge that she was covered except, perhaps, for the tooth implantation, because her surgery was not in any way cosmetic. Inasmuch as Blue Cross, by the terms of its letter, had already notified the doctor and the hospital of its limited but immaterial reservation, the doctors and the hospital proceeded to provide Alford services with the assurance that Alford was covered.

Alford's surgery was performed under general anesthesia and was successful. Her hospital bill, which later resulted in a stipulation for judgment in favor of University Hospital in the sum of $10,371.36 included $1,536.00 for the anesthesia. She also received a bill from Dr. Luc Frenette, the anesthesiologist, in the sum of $1,102.00 for his services. Alford received a copy of her hospital bill. It said "THIS IS NOT A BILL, Your insurance company has been billed." Neither the hospital bill nor Dr. Frenette's bill was paid by Blue Cross.

The reasons given for denial were somewhat enigmatic. It was not until April 14, 1992, that Blue Cross wrote Dr. Louis, with a copy to Alford, questioning a *"proposed* iliac bone graft of the mandible, mandibular nerve repositioning, and a split thickness skin graft." (emphasis supplied). The surgery had already taken place, something Blue Cross had every reason on April 14, 1992, to know. No hospitalization was then "proposed." From the evidence, this court, who is not a dental surgeon, cannot be sure of the extent, if any, that the services made the subject to Alford's claim permanently altered her "dental occlusion" or changed any "vertical dimension" of her jaw. This may or may not be the reason Dr. Louis made his distinction between his charge for implantation and his charge for the bone grafting and nerve repositioning.

Contemporaneously with refusing to pay any part of the hospital bill, Blue Cross paid Dr. Louis for his surgical services other than for the implantation portion which had been paid by Alford and was never billed to Blue Cross.

At trial, Blue Cross's only witness was Dr. Norman Davidson, a dentist employed full time by Blue Cross as a claims evaluator. Dr. Davidson tried but failed satisfactorily to explain to this court how to reconcile the TMJ provision in the plan summary with paragraph 23 of the "exclusions" in the plan itself. Dr. Davidson acknowledged that, despite the Blue Cross letter of April 7, 1995, this surgery was not cosmetic and that Blue Cross's tentative reservation based on the possibility that the surgery was cosmetic was totally erroneous. He also testified that Blue Cross's payment to Dr. Louis constituted a mistake by Blue Cross, but not one it has sought to rectify. Blue Cross's primary argument in support of its decision not to pay seems now to be based on paragraph 41 of the "exclusions," which purports to preclude all claims for treatment within the oral cavity, which, according to Dr. Davidson, would include anything dental in nature. Dr. Louis, Alford's treating surgeon who sought and obtained the precertification and who himself was paid by Blue Cross, testified as follows:

Q. Is there any question, Doctor, but that all of the surgery took place within the oral cavity?

A. That's incorrect.

Q. That is not correct?

A. That is incorrect.

Q. What surgery was not performed within the oral surgery?

A. The harvest of bone graft from the patient's hip.

Q. And then that was placed within the oral cavity?

A. That is correct.

Q. The repair and the problem was within the oral cavity, the patient's problem?

A. Part of the patient's problem was.

Q. What problem would not have been within the oral cavity?

A. The temporomandibular joint is not a part of the oral cavity.

Q. But the only surgery that was performed—or the only part of the surgical procedure that would not have been within the oral cavity would have been that that would have required you to get a portion of the bone?

A. That's correct.

Q. To put within the oral cavity?

A. That's correct.

Q. And you have told us that it is, to use your words, I believe, a fine line between something being medical in nature and dental in nature?

A. That's correct.

Q. And if one physician or one dentist might have one opinion and another dentist or physician might have another opinion, would that be accurate, Doctor?

A. I can't comment. That's your interpretation. I guess that could be.

Q. Would it be fair to say that the procedure would have been primarily dental in nature?

A. No, I would not call an iliac crest bone graft to the mandible a dental procedure.

The procedure to graft to the mandible is not a dental procedure. The placement of implants is a dental procedure.

### Conclusions of Law

This court has subject matter jurisdiction over the controversy pursuant to 28 U.S.C. § 1331.

■ Blue Cross had the burden of proving that it did not have a sufficient interest in denying this claim to subtract from its right to exercise the discretion recognized in *Firestone v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). It did not meet this burden. The decision here made by Blue Cross is entitled to no deference. Alford's claim is to be judged *de novo* rather than for an abuse of discretion or by evaluating Blue Cross's decision for being arbitrary and capricious or not. See *Florence Nightingale Nursing Service v. Blue Cross/Blue Shield of Alabama*, 41 F.3d 1476 (11th Cir.1995). Frankly, even if this claim were judged under the "arbitrary and capricious" standard, Blue Cross's decision could be only described as strange and difficult to explain logically to a reasonable insured or to a reasonable provider of medical services.

■ The pertinent language in the plan summary is impossible to square with the language in the plan itself. Dr. Davidson's attempt to reconcile the two documents left the court puzzled. In particular, the court does not understand Dr. Davidson's contention that TMJ surgery is sometimes covered and sometimes not. The reference to Phase I and Phase II leaves the court confused. The contract language, if carefully read, could have easily confused a sophisticated hospital administrator or physician. It would certainly have confused any layperson. This patent ambiguity, coupled with the actions taken by Blue Cross, call for this court to resolve the ambiguity in favor of Alford and against Blue Cross. Not only are insurance contracts necessarily construed against the insurer (here, for this purpose, Blue Cross *was* the insurer), but when the actions and statements of a claims administrator are inconsistent with its subsequent denial of coverage, the principle of estoppel intervenes and provides the appropriate interpretation. See *Kane v. Aetna Life Ins.*, 893 F.2d 1283 (11th Cir.1990). It is highly significant here that Blue Cross *precertified* this surgery and thereafter paid the doctor. That bold print which says "If you do not receive approval prior to a hospital admission, Blue Cross and Blue Shield of Alabama will not pay for your hospital stay" could only be fairly and reasonably construed as telling the insured that

"If you *do* received approval prior to a hospital admission, Blue Cross *will* pay for your hospital stay." Furthermore, *Branch v. Bernd Company*, 955 F.2d 1574 (11th Cir. 1992), entitles a plan beneficiary to rely on the language of a plan summary to the extent it is inconsistent with the plan itself. In this case Alford relied on the plan summary which was more favorable than the plan, and was entirely justified in doing so, particularly when the favorable reaction by Blue Cross to her request for precertification was consistent with her understanding of the plan summary. Blue Cross's after-the-fact retreat from coverage is inexcusable under the totality of circumstances.

Blue Cross does not claim that this surgery was not medically necessary or that the hospital's and the anesthesiologist's charges were not reasonable.

Based on her covered expenses, Alford is entitled to the sum of $10,371.36 for the hospital charges, $1,102.00 for Dr. Frenette's charges, and pre-judgment interest on both in the amount of 1.5% per month from April 8, 1992. See *Ala.Code* § 27–1–17(b) and *Florence Nightingale Nursing Service v. Blue Cross/Blue Shield of Alabama*, 41 F.3d 1476, 1483 (11th Cir.1995). She is not entitled to recover what she paid to the surgeon for the implantation portion of the surgery.

A separate final judgment in the amount claimed, except for the amount paid for implantation, will be entered.